**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **THE SCOOTER STORE, INC., ET AL,** | : | |
| | : | **Case No. 2:10-cv-18** |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **SPINLIFE.COM, LLC,** | : | |
| | : | **MAGISTRATE JUDGE DEAVERS** |
| **Defendant.** | : | |
| | : | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on Plaintiffs', The Scooter Store Inc. and The Scooter

Store, Ltd., Partial Motion to Dismiss (Dkt. 64) Defendant's, SpinLife.com, LLC, First Amended

Counterclaim (Dkt. 61). The Scooter Store, Inc. and The Scooter Store, Ltd. will be collectively

referred to as "TSS." TSS moves to dismiss counts one two, four, and six of SpinLife's First

Amended Counterclaim for failure to state claims upon which relief can be granted. For the

reasons stated below, TSS's Partial Motion to Dismiss is **GRANTED** in part and **DENIED** in

part.

### II. BACKGROUND

#### A. Factual Background

##### 1. The Parties

Plaintiff, The Scooter Store, Inc., is a Nevada corporation whose principal place of

business is Comal County, Texas. Plaintiff, The Scooter Store, Ltd., is a Texas limited

partnership having its principal place of business in Coman County, Texas. Since it was founded

1

in 1991, the majority of TSS's business has been in providing insurance claims processing services related to the purchase of electric wheelchairs and scooters by, and delivery and repairs to, the Medicare Part B Program, and its beneficiaries. In this regard, TSS owns four federal trademark registrations – Registration Nos. 2,710,502; 2,714, 979; 2,912, 774; and 3,017, 227 – for the "insurance claims processing for others; maintenance and repair services for wheelchairs, power chairs, lift chairs and motorized scooters; delivery of wheelchairs, power chairs, lift chairs and motorized scooters."

Defendant, SpinLife.com LLC, is an Ohio corporation having its principal place of business in Columbus, Ohio. SpinLife, since its founding in 1999, has been engaged in the retail sale of durable medical supplies through the internet. Unlike TSS, SpinLife does not accept assignments of its customers' Medicare claims, nor does Medicare pay SpinLife for the products it provides to its customers.

## 2. The Dispute

TSS initially filed suit in the Western District of Texas. TSS's allegations are based on purchases of Google AdWords. Google, like most Internet search engines, engages in advertising sales in which it auctions search keywords to advertisers. If a person searches on Google using one of the keywords, the advertiser's ad will appear next to the search results. This feature allows retailers to target potential customers searching for their products. TSS alleges that SpinLife purchased the phrase "the Scooter Store" from Google AdWords as part of a plan to confuse TSS's customers. SpinLife also placed these words in meta tags on its website, www.spinlife.com, and other places on the internet. These actions, TSS contends, are actionable trademark infringement and unfair competition.

SpinLife counterclaimed. In 2005, the United States Department of Justice ("DOJ")

2

alleged that TSS had engaged in improper business practices related to Medicare and its beneficiaries. TSS settled with the DOJ in 2007. Following the settlement, TSS expanded its services in the retail sales market. After the expansion, it approached SpinLife about acquiring the company, but no agreement was ever reached. In 2009, TSS again contacted SpinLife and indicated that it believed that SpinLife was violating its alleged trademark rights. SpinLife contends that TSS used the threat of litigation to force SpinLife to agree to anticompetitive terms. When SpinLife did not agree, TSS brought suit. SpinLife alleges that TSS is using litigation to eliminate competition and obtain a monopoly through the unjustified expansion of their trademarks. Further, SpinLife alleges that TSS seeks to use the costs of litigation to drive SpinLife out of the retail sales market for power mobility devices.

### 3. Alleged Misconduct Before the United States Patent and Trademark Office

SpinLife alleges that TSS committed fraud on the United States Patent and Trademark Office ("USPTO") because it failed to report that it had knowledge of another state registration of "The Scooter Store" in its trademark application. In 1991, Edwin Trautman founded Ohio Mobility as a sole proprietorship in Akron, Ohio. The company sells and services durable medical equipment. During the 1990s, it started using the name "The Scooter Store," and in 1995 it formally obtained and recorded the trade name "The Scooter Store" with the Ohio Secretary of State. In 1997, it incorporated as Ohio Mobility, Inc., d/b/a The Scooter Store. In 2002, the business began operating as a limited liability company, d/b/a Ohio Mobility, The Scooter Store. It continues to operate today.

During the 1990s, Trautman spoke by telephone several times with Doug Harrison, the President and CEO of TSS. During each of these conversations, Trautman introduced himself as

3

from "Ohio Mobility, The Scooter Store." At no time during these conversations did Harrison object to this use of "The Scooter Store". In 2006 and 2008, Trautman retained attorneys to send communications to TSS, advising them that their use of "The Scooter Store" in the state of Ohio violated Ohio Mobility, The Scooter Store's trade name rights and requesting that they cease and desist their improper use.

In addition to these conversations, TSS had knowledge of Ohio Mobility, The Scooter Store as a result of investigations it undertook. In 2006, 2008, and 2008, TSS sent an investigator to look into Mr. Trautman's business.

In 2000, TSS applied for a trademark of "The Scooter Store" for use in insurance claims processing and retail sales. TSS did not disclose Trautman's Ohio trade name registration, actual use or right to use, to the USPTO when it filed its applications. The USPTO granted TSS's application for: insurance claims processing for others; maintenance and repair services for wheelchairs, power chairs, lift chairs, and motorized scooters; and delivery of wheelchairs, power chairs, lift chairs, and motorized scooters. TSS was assigned U.S. Registration Nos. 2,710,502; 2,714, 979; 2,912, 774; and 3,017,227. The USPTO denied TSS's application for a trademark of "The Scooter Store" in the retail sales market. It issued a determination finding "The Scooter Store" to be generic for retail sales, merely descriptive of the retail and mail order sale of scooters, and incapable of identifying The Scooter Store's services and distinguishing them from others. It refused registration of the proposed mark. Accordingly, TSS does not have a trademark registration for the retail sale of goods. Its trademarks, if valid and enforceable, are limited to insurance claims.

TSS did not disclose its knowledge of Trautman's Ohio registration when it applied for

4

incontestability as to Registration Nos. 2,714,979 and 2,710,502 in 2008.

## B. Procedural Background

In its Amended Complaint, TSS asserts the following claims: (1) Federal Unfair Competition; (2) State Unfair Competition (based on Texas law); (3) State dilution (based on Texas law); (4) Federal Trademark Infringement; (5) State Trademark Infringement (based on Texas law); and (6) Unjust Enrichment and Misappropriation. TSS requests punitive and exemplary damages, a declaratory judgment that SpinLife's actions are unlawful, and injunctive relief.

SpinLife moved to transfer venue to this Court. After the motion was granted, SpinLife filed an Amended Counterclaim, asserting: (1) a Sherman Act violation; and (2) Ohio Unfair Competition. SpinLife requests a declaratory judgment of non-infringement of Trademark Registration Nos. 2,710,502; 2,714, 979; 2,912, 774; and 3,017, 227 under the Lanham Act; a declaratory judgment that U.S. Registration Nos. 2,710,502; 2,714, 979; 2,912, 774; and 3,017, 227 are invalid; a declaratory judgment that purchase of "The," "Scooter" and "Store" keywords and phrases does not infringe Trademark Registration Nos. 2,710,502; 2,714, 979; 2,912, 774; and 3,017, 227; and a declaratory judgment that Registration Nos. 2,710,502; 2,714, 979; 2,912, 774; and 3,017,227 are unenforceable.

TSS moves to dismiss counts one, two, four, and six of SpinLife's Amended Counterclaim. The motion has been fully briefed, and is now ripe for decision.

## III. STANDARD OF REVIEW

A case may be dismissed if the complaint does not state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). A "motion to dismiss for failure to state a claim is a test of the

plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). Consequently, the Court must construe the complaint in the light most favorable to the non-moving party, accept all factual allegations as true, and make reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008)*; Murphy v. Sofamor Danek Gp.,Inc.*, 123 F.3d 394, 400 (6th Cir. 1997). The Court is not required, however, to accept as true mere legal conclusions unsupported by factual allegations. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 555, 127 S. Ct. 1955 (2007)).

Although liberal, the Rule 12(b)(6) standard requires more than the bare assertion of legal conclusions to survive a motion to dismiss. *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted). The complaint must "'give the defendant fair notice of what the claim is, and the grounds upon which it rests.'" *Nader v. Blackwell*, 545 F.3d 459, 470 (6th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007)). While a complaint need not contain "detailed factual allegations," its "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964 (2007). A complaint that suggests "the mere possibility of misconduct" is insufficient; rather, the complaint must state "a plausible claim for relief." *Iqbal*, 129 S.Ct. at 1950 (*citing Twombly*, 550 U.S at 556).

## IV. LAW AND ANALYSIS

TSS argues that this Court should dismiss counts one, two, four, and six because SpinLife has not pled plausible claims for relief. SpinLife makes two affirmative defenses: (1) fraud

6

before the USPTO; and (2) unclean hands.

## A. Fraud Before the USPTO

### *1. Fraud in 2000*

SpinLife alleges that TSS committed fraud upon the USPTO when it filed its trademark application for "The Scooter Store" mark in 2000. In a trademark application, the applicant must aver an oath that "no other person, firm, corporation, or association has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. §1051(3)(D). SpinLife alleges that TSS did not take this oath honestly because it did not include Trautman's Ohio registration in its application.

Fraud upon the USPTO in the procurement of trademark registrations may be raised as a defense to a claim of trademark infringement. The defense, however, is disfavored, and carries a heavy burden of proof. *See Anheuser-Busch, Inc. v. Bavarian Brewing Co.*, 264 F.2d 88, 92 (6th Cir. 1959).

Fraud occurs when the applicant knowingly makes false, material misrepresentations of fact to the USPTO with the intent to deceive. *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009). In order to withstand a motion to dismiss, a petitioner contending that the declaration or oath in the defendant's application for trademark registration was fraudulent because it failed to disclose use by others, must allege particular facts which, if proven, would establish four elements: (1) there was in fact another use of the same or a confusingly similar mark at the time the oath was signed; (2) the other user had legal rights superior to applicant's rights; (3) applicant knew that the other user had rights in the mark superior to the applicant's, and either believed

7

that a likelihood of confusion would result from applicant's use of its mark or had no reasonable

basis for believing otherwise; and (4) applicant, in failing to disclose these facts to the Patent and

Trademark Office, intended to procure a registration to which applicant was not entitled. *Ohio

State Univ. v. Ohio Univ.*, 51 U.S.P.Q.2d 1289, 1293 (T.T.A.B. 1999).[1]

SpinLife satisfies the first two elements, but fails to satisfy the third and fourth elements

of the four part test articulated in *Ohio State*. Looking to the first element, SpinLife alleges that

TSS had knowledge of the use of "The Scooter Store" by an Ohio company that engaged in the

retail sales of power mobility devices when it filed its application for federal trademarks.

Assuming this is true, the use of "The Scooter Store" by a competing company would likely

constitute "another use of the same or a confusingly similar mark."

As to the second element, SpinLife must plead facts that show that a third party had legal

rights superior to TSS's rights. Trademark "ownership is not acquired by federal or state

registration. Rather, ownership rights flow only from prior appropriation and actual use in the

market." *Homeowner's Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir.

1991). The first to use the mark in commerce[2] establishes common law ownership in the

geographic area where the mark is used and is known as the senior user of the mark. *Allard

Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001). While

---

[1]The decisions of the Trademark Trial & App. Bd. are not binding on this Court. Nonetheless, they are "to be accorded great weight." *Buti v. Perosa, S.R.L.*, 139 F.3d 98, 105 (2d Cir. 1998) (quoting *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989). *See also In re De Pepper Co.*, 836 F.2d 508, 510 (Fed. Cir. 1987) ("While the interpretations of the statute by the board are not binding on this court, under general principles of administrative law, deference should be given by a court to the interpretation by the agency charged with its administration.").

[2] A mark "shall be deemed to be in use in commerce . . . when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. §1127.

8

federal registration of a mark serves as prima facie evidence of ownership and the registrant's exclusive right to use the mark in commerce, it does not eliminate the prior nonregistered, common law rights of others. These common law rights of the senior user are superior to the federal registration of a junior user within the senior user's geographic territory. *Id.* Thus, the junior user may have the right to use its federal trademark except to the extent that it infringes on the common law rights of the senior user. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100 (1918) (finding that the prior use of a trademark in a remote geographic area does not justify the cancellation of the registered mark of a second user who acquired trademark rights in good faith); *Allard Enters.,* 249 F.3d at 572 (finding that the federal registration of the junior user freezes the geographic scope of the senior user's territory).

 As applied to the instant case, SpinLife argues that Trautman may have superior rights, but it cannot be determined on the available facts. Doug Harrison founded TSS and began using "The Scooter Store" mark in 1991. Trautman founded Ohio Mobility in 1991, and the company has used various trade names, including "The Scooter Store," since.[3] Thus, both companies could have started using the mark at some point in 1991 and either could emerge as the senior user during discovery. If Trautman's use of the mark was prior in time to SpinLife's use, then he may be able to establish a common law right to the mark and overcome the presumption established by SpinLife's federal registration. At this stage of the litigation, all that is required is that SpinLife plead facts that show that Trautman may prove to be the senior user. As SpinLife has done so, it has established element two.

---

[3] TSS argues that Trautman did not start using "The Scooter Store" until 1995. At the motion to dismiss stage, the Court must accept all factual allegations in the complaint/counterclaim as true. The debate over the date of use is appropriate for summary

9

The third element requires that SpinLife allege facts that TSS *knew* that Trautman had superior or clearly established rights[4] and that TSS either believed that confusion would result from TSS's use or had no reasonable basis to believe otherwise. In other words, SpinLife must allege facts that TSS did not have an honest, good faith belief that TSS was entitled to registration of "The Scooter Store," and that TSS intentionally deceived the USPTO in its application.

SpinLife contends that when TSS filed its trademark application in 2000 it had knowledge of Trautman's use of "The Scooter Store" in Ohio because an officer of TSS had spoken to Trautman on the phone several times during the 1990s. Further, it asserts that TSS did not disclose that "The Scooter Store" was registered as an Ohio trade name because it intended to cause reliance on the misrepresentation and improperly procure a trademark registration. Mere knowledge, however, of another's actual use of a mark is insufficient to show bad faith. *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 755-56 (9th Cir.); *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670-72 (7th Cir. 1982). The petitioner must also allege that the defendant believed that the other user had superior or clearly established rights. Even assuming that the facts are true, SpinLife cannot satisfy these pleading requirements. A state trademark registration does not prevent another user from obtaining a federal registration to a mark. *See Money Store*, 689 F.2d at 673 (finding that federal registrant did not act fraudulently when it failed to disclose state registrations of the mark); *Visa Int'l Serv. Ass'n v. Visa Realtors*, 208 U.S.P.Q. 462 (T.T.A.B. 1980) (finding that neither state incorporation nor state registration is

---

judgment, should summary judgment motions be filed.

[4]Rights are "clearly established" by "a court decree, by the terms of a settlement agreement, or by a [competing] registration." *Rosso & Mastracco, Inc. v. Giant Food Inc.*, 720

10

evidence of use of a mark).

In *Money Store*, for example, the federal trademark applicant ran a trademark search and uncovered four separate state registrations for its mark: Utah, Virginia, West Virginia, and Minnesota. The applicant did not disclose the state registrations in its application. The Seventh Circuit held that, because the state registrations did not stand in the way of a federal trademark registration, the failure to disclose was not fraud. *Money Store*, 689 F.2d at 668-73. In this case, TSS had a reasonable basis for not disclosing the information because, as a matter of law, the state trademark registration could not inhibit the federal registration. Even if proven, these facts do not establish that TSS believed or had no reasonable basis not to believe that Trautman had a superior or clearly established right to the mark. Accordingly, SpinLife has not pled facts adequate to establish element three.

The fourth element requires that SpinLife allege facts that TSS intended to procure a registration to which it was not entitled. If a petitioner fails to plead adequately the third element, "[a] fortiori, petitioner has also failed to sufficiently plead the fourth element of the claim, i.e., that respondent willfully deceived the PTO by failing to disclose petitioner's rights in the mark, in an effort to obtain a registration to which it knew it was not entitled." *Intellimedia Sports Inc. v. Intellimedia Corp.*, 43 U.S.P.Q.2d 1203, 1208 (TTAB 1997). Accordingly, SpinLife has not established element four.

SpinLife has failed to plead adequately elements three and four of the pleading requirements for fraud based on failure to disclose in the oath before the USPTO. Accordingly, SpinLife has not pled facts sufficient to support the affirmative defense that TSS committed

---

F.2d 1263, 1266 (Fed. Cir. 1983).

fraud on the USPTO in 2000.

## 2. Fraud in 2008

SpinLife alleges that TSS committed fraud on the USPTO when it filed for incontestability for Registration Nos. 2,710,502 and 2,714,979 in 2008.[5] TSS submitted to the USPTO separate Combined Declarations of Use and Incontestability Under Sections 8 and 15 of the Trademark Act. In a §8 affidavit, a party must swear that the mark is in use in commerce. In a §15 affidavit, a party must swear that "there has been no final decision adverse to the registrant's claim of ownership of said mark nor to its right to register the same or maintain it on the register." 15 U.S.C. §1065

As with fraud in the procurement of registrations, fraud in an application for incontestability occurs when the applicant knowingly makes false, material misrepresentations of fact to the USPTO with the intent to deceive. *In re Bose*, 580 F.3d at 1245. If proved, such fraud may jeopardize the incontestability claim as well as the underlying registration. *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990).

SpinLife has not pled any facts that TSS made false statements in either its §8 or §15 affidavits. Accordingly, it has not it has not pled facts sufficient to support the affirmative defense that TSS committed fraud on the USPTO in 2008.

### B. Unclean Hands

SpinLife contends that TSS comes before this Court with unclean hands. The doctrine of unclean hands is "a self-imposed ordinance that closes the doors of a court of equity to one

---

[5]A mark is incontestable under 15 U.S.C. §1065 when it has been in continuous use for five consecutive years subsequent to the date of registration and it still in use in commerce. An incontestable mark is conclusive evidence of the validity of the mark, subject only to the

tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814 (1945). "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation" of the unclean hands doctrine. *Id.* at 815. If a plaintiff is suing for trademark infringement, fraud in the procurement of the mark may constitute unclean hands. *Cf. Unreal Corp. v. Masters*, 413 F. Supp. 873, 875-76 (N.D. Ill. 1976) (noting that when unclean hands is raised as an affirmative defense in an unfair competition case, the court's role is "to protect the consuming public from commercial dishonesty"). Additionally, if such a plaintiff brings suit "to browbeat and coerce" defendants allegedly using its mark, this action may also give rise to an affirmative defense of unclean hands. *Cf., Esquire, Inc. v. Esquire Slipper Mfg. Co.*, 243 F.2d 540, 545 (1st Cir. 1957) (denying an appeal asserting an unclean hands defense because the plaintiff's overenthusiastic zeal to protect its mark did not rise to the level of "an attempt to browbeat and coerce"). As the Sixth Circuit has stated, "(f)raud or unclean hands are not to be lightly inferred. They must be established by 'clear, unequivocal and convincing' evidence." *Kearney & Trecker Corp. v. Cincinnati Milacron Inc.,* 562 F.2d 365, 371 (6th Cir.1977) (quoting *Schnadig Corp. v. Gaines Mfg. Co.*, 494 F.2d 383, 392 (6th Cir. 1974).

SpinLife asserts that TSS has unclean hands because it committed fraud in the procurement of the mark and brought this lawsuit in bad faith. While SpinLife has not adequately pled that TSS committed fraud, it has presented sufficient facts to support a claim that TSS brought this lawsuit in bad faith. Accordingly, it has adequately pled the affirmative

---

defenses enumerated in 15 U.S.C. §1115. 15 U.S.C. §1065.

defense.

### C. Count One: Sherman Act Violation

SpinLife alleges that TSS has violated the Sherman Act by filing a baseless trademark infringement lawsuit against SpinLife. SpinLife argues that TSS filed its lawsuit in order to obtain and maintain monopoly power over the market of power mobility devices. TSS argues that this count should be dismissed because: (1) TSS's trademark infringement lawsuit against SpinLife does not constitute an antitrust violation because TSS is immune from liability under the *Noerr-Pennington* Doctrine; and (2) SpinLife has failed to plead the elements required for an antitrust counterclaim.

### 1. The **Noerr-Pennington** *Doctrine*

The *Noerr-Pennington* Doctrine creates a limited immunity from the antitrust laws by rendering them inapplicable to individual or group action designed to influence legislative, executive, administrative, or judicial activity. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). Thus, the owner of a trademark is entitled to protect its registered rights through litigation without exposing itself to Sherman Act liability. *See California Motor Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (extending the "philosophy" of *Noerr* and *Pennington* to "the approach of citizens or groups of them to administrative agencies . . . and to courts."). *See also Leopold v. Henry I. Siegel, Co.*, No. 86 Civ. 0063, 1987 WL 5373, at *4 (S.D.N.Y. Jan. 5, 1987) ("A trademark owner is entitled to advise others of his trademark rights, to warn others that they or others are or may be infringing his rights, to inform others that he is seeking to enforce his rights through legal proceedings, and to threaten accused infringers and

14

their customers with suit.") (citing *Lucien Lelong, Inc. v. Dana Perfumes, Inc.*, 138 F.Supp. 575, 579 (N.D. Ill. 1955); *Fed. Sign & Signal Corp. v. Bangor Punta Operations, Inc.*, 357 F. Supp. 1222, 1240-41 (S.D.N.Y. 1973)). Such actions are examples of the fair and aggressive competition that trademark policies and antitrust laws are intended to protect. *See California Motor Co.*, 404 U.S. at 510.

There is, however, an exception to the *Noerr-Pennington* Doctrine. The sham exception withholds immunity when petitioning conduct is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144. The Supreme Court has established a two-part test for "sham" litigation:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor,' through the 'use [of] the governmental *process* -- as opposed to the *outcome* of that process -- as an anti competitive weapon.'

*Prof'l. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.* 508 U.S. 49, 60-61 (1993) (quoting *Noerr*, 365 U.S. at 144; *City of Columbia v. Omni Outdoor Advertising, Inc.*, 449 U.S. 365, 380 (1991)).

The first prong requires that a lawsuit must be "objectively baseless." SpinLife alleges that TSS filed an "objectively baseless" lawsuit to enforce trademark registrations that TSS knew to be limited, invalid, and unenforceable as to SpinLife and its retail sale business. TSS's trademarks are limited to insurance claims processing; they do not extend to retail sales. While TSS may protect its trademarks through an infringement suit, it cannot use such a suit to expand those trademarks. The second prong requires that the Court consider whether a party is using the process of litigation to interfere with a competitor's business. In this case, SpinLife alleges that TSS is using litigation, and the expenses SpinLife must incur to defend itself, to drive SpinLife from the motor scooter retail market. Accordingly, SpinLife has satisfied both prongs of the test for the sham exception.

Moreover, whether a party's conduct is a genuine attempt to avail itself of the judicial process or is merely a sham is a question of fact that is inappropriate for a motion to dismiss. *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1253 (9th Cir.). Accordingly, as SpinLife has pled sufficient facts to support the sham exception, immunity from antitrust liability cannot attach to TSS at this stage of the litigation. *See Nabi Biopharm. v. Roxane Labs., Inc.*, 2007 WL 894473, at *4 (S.D. Ohio March 21, 2007) (finding that counterclaim alleging that infringement suit was objectively baseless and concealing an attempt to interfere directly with the business relationships of a competitor adequately stated a claim and should not be dismissed); *Wabash Pub. Co. v. Flanagan*, No. 89 C 1923, 1990 WL 19977, at *4 (N.D. Ill. Feb. 27, 1990) (finding that defendant had pled sufficient facts to support a counterclaim under the Sherman Act and the sham litigation exception applied); *Comptek Research, Inc. v. Barrister Legal Support Servs., Inc.*, Civ. No. 81-0954, 1981 WL 48146, at *1

16

(D. D.C. Dec. 21, 1981) (denying motion to dismiss Sherman Act counterclaim because "an 'effort to extend a trademark monopoly beyond its legal limits,' resulting in actual damage to competitors, though difficult of proof, would be actionable under the Sherman Act") (quoting *La Maur, Inc. v. Alberto-Culver Co.,* 179 U.S.P.Q. 607, 615 (D. Minn. 1973), *aff'd.*, 496 F.2d 618 (8th Cir. 1974))).

### 2. Attempted Monopolization

In order to plead a claim for attempted monopolization under Section 2 of the Sherman Act,[6] a plaintiff must establish three elements: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The plaintiff does not have to show that the defendant has succeeded in establishing monopoly power, but must show that the defendant is able seriously to attempt the achievement of monopoly status. *Lorain Journal Co. v. United States*, 342 U.S. 143, 153-54 (1951).

### a. Predatory or Anticompetitive Conduct

The first element of an attempted monopolization claim is predatory or anticompetitive conduct. The purpose of the Sherman Act is to protect the public from the failures of the market. In an effort to further this goal, the Act regulates "conduct that unfairly tends to destroy competition" itself. It seeks to foster, not chill, competition. *Spectrum Sports,* 506 U.S. at 448. Accordingly, the Sixth Circuit defines anticompetitive conduct as "conduct designed to destroy

---

[6]Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by

17

competition, not just to eliminate a competitor." *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 823 (6th Cir. 1982). In particular, using litigation unlawfully to extend trademarks or to destroy competition is anticompetitive conduct. *See Benton Prods. Enters., Inc. v. Motion Media*, 125 F.3d 855, 858 (6th Cir. 1997) (per curiam) ("The filing of a lawsuit solely as an act of business aggression, rather than, as a method of resolving an honest dispute may be a method of unfair competition."); *Comptek Research, Inc.*, 1981 WL 48146, at *1.

As applied to this case, SpinLife alleges that TSS is using litigation to drive it from the retail sales market for power mobility devices. TSS has a trademark for insurance claims processing. When TSS applied for this trademark, it also applied for a trademark of "The Scooter Store" for retail sales. The USPTO found that the phrase was generic and refused to register the mark. SpinLife alleges that TSS is using litigation to prevent the use of "The Scooter Store" in the retail sales market. According to SpinLife, TSS seeks to enforce its limited trademark beyond its scope and expand its reach from insurance claims to the retail sale of goods. Further, SpinLife alleges that TSS is using this litigation and its accompanying costs to drive SpinLife out of business. Assuming these facts to be true, these acts are sufficient to establish that TSS is using litigation to destroy competition and thus has engaged in anticompetitive conduct.

### b. Specific Intent to Monopolize

In the second element of an attempt to monopolize claim, the plaintiff must allege facts that show "a specific intent to 'destroy competition or build a monopoly.'" *Conwood Co., L.P. v. United States Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (quoting *Tops Mkt., Inc. v. Quality*

---

both said punishments, in the discretion of the court. 15 U.S.C. §2

*Mkts., Inc.*, 142 F.3d 90, 101 (2d Cir. 1998). "Specific intent to monopolize may be inferred from evidence of anticompetitive conduct . . . but not from legitimate business practices aimed only at succeeding in competition. *Arthur S. Langenferder, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1432 (6th Cir. 1990). While the intent to increase market share is a normal desire of competitors and does not reveal intent to monopolize, the desire to crush competitors does. *Richter Concrete Corp.*, 691 F.2d at 826. Thus, bad faith or malicious purposes can transform a common business practice into anticompetitive conduct. *See Alles Corp. v. Senco Prods., Inc.*, 329 F.2d 567, 572 (6th Cir. 1964) ("The purpose or intent to create or maintain a monopoly transforms what might otherwise be a legal method of doing business into an illegal method under Section 2 of the Sherman Act.")

     SpinLife's allegation that TSS is using its larger size, and accompanying larger revenue, to absorb the litigation costs and drive its competitors out of business is not unrealistic in a world of rising fees and expenses. If the sham exception applies, using litigation or the threat of litigation to harass and eliminate competition is sufficient to establish a specific intent to monopolize at the motion to dismiss stage. *See Lektro-Vend Corp. v. Vendo Co.*, 403 F.Supp. 527, 534 (D.C. Ill. 1975), *affirmed* 545 F.2d 1050 (7th Cir. 1976), *reversed on other grounds* 433 U.S. 623 (1977), (finding that using litigation to harass or eliminate competitors is evidence of specific intent to monopolize); *Handgards, Inc. v. Johnson and Johnson*, 413 F. Supp. 921, 924-25 (N.D. Cal. 1975), *disapproved of on other grounds by Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451 (9th Cir. 1979) (finding that "the bringing of a series of ill-founded patent infringement actions, in bad faith, can constitute an antitrust violation in and of itself if such suits are initiated or pursued with intent to monopolize a particular industry (and, of course, the other

elements of a Section 2 violation are present"). Accordingly, SpinLife has sufficiently pled the specific intent to monopolize.

### c. Dangerous Probability of Achieving Monopoly Power

The third element of an attempted monopolization claim is a dangerous probability of achieving monopoly power. In pleading this element, the plaintiff must first define the relevant market, and then plead facts from which the Court can infer that the defendant has a dangerous probability of achieving monopoly power. *Conwood Co., L.P.*, 290 F.3d at 782.

First, SpinLife has pled the relevant market. "A geographic market is defined as an 'area of effective competition,'" which is the zone in which buyers have the opportunity to purchase reasonably interchangeable or identical products from different suppliers. *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999) (quoting *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977)). SpinLife defines the relevant geographic market as the United States and Canada.

Second, Spinlife has pled that TSS's market power shows that it has a dangerous probability of achieving monopoly power. The Sixth Circuit has defined monopoly power as the ability "to raise prices or to exclude competition when it is desired to do so." *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 935 (6th Cir. 2005) (quoting *Byars v. Bluff City News Co. Inc.*, 609 F.2d 843, 850 (6th Cir. 1979) (internal citations omitted)). As the existence of this power "ordinarily is inferred from the seller's possession of a predominant share of the market," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992), the principal factor in determining market power is market share. At the motion to dismiss stage, with discovery still to be completed, the plaintiff does not have to allege an exact, percentage-based market share. *See*

20

*Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001) ("At this stage, it is sufficient that plaintiff has alleged specific facts that support a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes."). Thus, it is necessary to consider other structural factors to determine if a seller has a dangerous probability of achieving monopoly power. These include: "the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct and the elasticity of consumer demand." *Int'l. Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 792 (2d Cir. 1987). *See Spirit Airlines, Inc.*, 431 F.3d at 952 (discussing structural factors); *White and White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 507 (6th Cir. 1983) (discussing structural factors).

In this case, SpinLife alleges that TSS is engaging in conduct that is explicitly designed to drive others from the relevant market and exclude competitors. By its own admission, TSS sells more power mobility equipment to mobility impaired persons than any of its competitors. Further, the facts in the complaint state that TSS is abusing its trademarks and attempting to enforce them beyond their proper scope. In effect, it is suing competitors to enforce a trademark that is limited to insurance claims in the retail sales market. This Court can infer that if TSS is successful, it would have the power to drive its competitors from the marketplace or reduce their market share. These facts are sufficient to establish that TSS has a dangerous probability of achieving monopoly power.

Antitrust actions are fact intensive, particularly where motive and intent are at issue, and so courts hesitate to grant motions to dismiss before the parties have an opportunity for discovery. *See Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir.

21

1998); *Picante, Inc. v. Jimenez Food Prods., Inc.,* No. SA-81-CA-625, 1982 WL 1891, at *2

(W.D.Tex. Aug. 15, 1982); *Wahl v. Rexnord, Inc.*, 481 F. Supp. 573, 589 (D. N.J. 1979), *rev. on*

*other grounds*, 624 F.2d 1169 (1980). As SpinLife has adequately pled the sham exception to

the *Noerr-Pennington* Doctrine, as well as the three elements of an attempted monopolization

claim under Section 2 of the Sherman Act, TSS's motion to dismiss court one is **DENIED**.

### D. Count Two: Ohio Unfair Competition

SpinLife's second claim is for common law unfair competition. It argues that TSS

brought suit in bad faith and with the malicious intent to drive SpinLife from the retail sales

market for power mobility devices.

Unfair competition is generally defined as selling the goods of a competitor or deceiving

the public as to the nature of goods. The tort, however, has grown to encompass a wide variety

of unethical business practices. In Ohio, malicious litigation is a basis for an unfair competition

claim. *See Water Mgmt., Inc. v. Stayanchi,* 472 N.E.2d 715, 717 (Ohio 1984) ("The concept of

unfair competition may also extend to unfair commercial practices such as malicious litigation,

circulation of false rumors, or publication of statements, all designed to harm the business of

another."); *Molten Metal Equip. v. Mataullies Sys. Co., L.P.*, No. 76407, 2000 WL 739470, at *5

(Ohio Ct. App. June 8, 2000); *Henry Gehring Co. v. McCue*, 154 N.E. 171, 171-72 (Ohio Ct.

App. 1926).

As a threshold matter, TSS relies on *Baxter Travenol Labs., Inc. v. LeMay*, 536 F.Supp.

247 (S.D. Ohio 1982), to argue that "in order to bring an action for malicious prosecution, the

prosecution of a civil proceeding must be at an end and must terminate in favor of the person

bringing the malicious prosecution claim." *Id.* at 248-49. The court in *Baxter Travenol*,

however, failed to recognize the distinction between a claim of malicious prosecution, and a claim of unfair competition based on malicious prosecution. These are different causes of action, and thus, different law governs. Under Ohio law, there is no requirement that the civil proceeding must have concluded before an unfair competition claim based on malicious prosecution can be brought. *Microsoft Corp. v. Action Software*, 136 F.Supp.2d 735, 740 n.5 (N.D. Ohio 2001) (discussing *Harco Corp. v. Corrpro Cos. Inc.*, No. 1465, 1986 WL 12338 (Ohio Ct. App. Oct. 29, 1986)).

Ohio courts analyze malicious prosecution claims under a bad faith standard, and evaluate whether the claim was initiated to harass or injure a rival who sells the same goods. *Henry Genring*, 23 Ohio Ct. App. at 171-72. In applying the bad faith standard, courts may consider whether malicious character drives the scope, context, timing, and intent of the litigation. *Am. Chem. Soc. v. Leadscope*, No. 08AP-1026, 2010 WL 2396544, at *7 (Ohio Ct. App. June 15, 2010). In *American Chemical Society v. Leadscope*, for example, the American Chemical Society brought an intellectual property action against former employees who had formed a new company, Leadscope. Leadscope counterclaimed, in part alleging unfair competition. At trial, the judge instructed the jury that the tort of unfair competition could be based on malicious litigation. On the unfair competition counterclaim, the jury found for Leadscope. On appeal, the court found that the evidence presented at trial supported claims that the litigation was "rooted in its alleged desire to suppress, by any means necessary" a competitor and thus satisfied the bad faith standard for malicious litigation. In particular, the court focused on the timing of the action. The American Chemical Society monitored LeadScope closely; it threatened and then commenced litigation only as the company increased in prominence. *Id.* at

23

*8-9.

Similarly, in this case, SpinLife alleges that TSS brought suit in bad faith. It contends that TSS attempted to acquire SpinLife in 2007. After failing in this effort, TSS threatened to use litigation to force SpinLife to stop using certain keywords in Internet advertising. When SpinLife refused, TSS brought suit. SpinLife alleges that TSS seeks to use the costs of litigation to drive SpinLife out of the retail sales market for power mobility devices. At the motion to dismiss stage, the Court is only concerned with whether SpinLife has pled sufficient facts to make out a plausible claim that TSS's suit was brought with a malicious intent. Accepting these factual allegations are true, these facts are sufficient to meet the standard. Accordingly, TSS's motion to dismiss count two is **DENIED**.

### E. Count Four: Declaratory Judgment

SpinLife's fourth count seeks a declaratory judgment that TSS's trademarks are invalid due to fraud and inequitable conduct by TSS during the prosecution of the trademarks at the USPTO. As SpinLife has not adequately pled that TSS committed fraud before the USPTO, the motion to dismiss count four is **GRANTED**.

### F. Count Six: Declaratory Judgment

SpinLife's sixth count seeks a declaratory judgment that TSS's trademarks are unenforceable due to fraud and inequitable conduct by TSS during the prosecution of the trademarks at the USPTO. As SpinLife has not adequately pled that TSS committed fraud before the USPTO, the motion to dismiss count six is **GRANTED**.

### V. CONCLUSION

For the reasons stated above, Plaintiffs', The Scooter Store Inc. and The Scooter Store,

Ltd., Partial Motion to Dismiss (Dkt. 64) Defendant's, SpinLife.com, LLC, First Amended

Counterclaim (Dkt. 61) is **GRANTED** in part and **DENIED** in part.  TSS's motion to dismiss

count one is **DENIED**.  TSS's motion to dismiss count two is **DENIED**.  TSS's motion to

dismiss count three is **GRANTED**.  TSS's motion to dismiss count four is **GRANTED**.

      **IT IS SO ORDERED.**


                                 **s/Algenon L. Marbley**
                                 **ALGENON L. MARBLEY**
                                 **UNITED STATES DISTRICT JUDGE**

      **DATED: March 28, 2011**